Counsel of Record:
Elaine C. Greenberg
Daniel M. Hawke
Denise D. Colliers
Mary P. Hansen
G. Jeffrey Boujoukos
Scott A. Thompson
Securities and Exchange Commission
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | **Case No.** |
| | : | |
| **Plaintiff** | : | |
| | : | **COMPLAINT FOR** |
| **v.** | : | **VIOLATIONS OF THE** |
| | : | **FEDERAL SECURITIES** |
| **J.P. MORGAN SECURITIES LLC,** | : | **LAWS** |
| | : | |
| **Defendant.** | : | |

Plaintiff, the United States Securities and Exchange Commission ("Commission"), 701

Market Street, Suite 2000, Philadelphia, Pennsylvania 19106, alleges as follows against

defendant, J.P. Morgan Securities LLC ("JPMS"), whose last known mailing address is 575

Washington Blvd, Floor 16, Jersey City, NJ 07310:

## SUMMARY

1.      This case involves various fraudulent bidding practices by JPMS, a registered

broker-dealer and municipal securities dealer, involving the temporary investment of proceeds

from the sale of tax-exempt municipal securities in certain reinvestment instruments by state and

local governmental entities in the United States ("Municipalities").  As described below, JPMS's

fraudulent practices, misrepresentations, and omissions affected the prices of the reinvestment

instruments, deprived the municipalities of a conclusive presumption that their reinvestment instruments were purchased at fair market value, and/or jeopardized the tax-exempt status of the underlying securities, thereby injuring numerous Municipalities.  During an eight-year period, JPMS rigged at least 93 transactions concerning the reinvestment of proceeds from the sale of over $14.3 billion of underlying municipal securities, generating millions of dollars in ill-gotten gains.

2.      From at least 1997 through at least 2005 (the "relevant time period"), JPMS engaged in fraudulent practices and made misrepresentations and omissions in connection with the bidding of certain municipal reinvestment instruments.  In most of the tainted transactions, JPMS, acting as the agent for its affiliated commercial bank, JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank"), placed bids, which constituted offers to provide the specific reinvestment product to the Municipalities.  In this role, JPMS acted as the agent for what is known as a "Provider."

3.      Acting as agent for a Provider, JPMS at times, (a) won bids because it obtained advance information concerning the competing Providers' bids, typically from the "Bidding Agent," who acted on behalf of the Municipalities and collected bids from Providers offering to provide the reinvestment products ("Last Looks"); (b) won bids set up in advance by the relevant Bidding Agent to enable JPMS to win because the Bidding Agent deliberately obtained off-market non-winning bids from other Providers ("Set-Ups"); and (c) facilitated Set-Ups that benefited other Providers by deliberately submitting purposely non-winning bids, including, but not limited to, Courtesy Bids (a type of purposely non-winning bid submitted in order to satisfy particular tax regulations) to Bidding Agents.

4.      As a result of the aforementioned fraudulent misconduct during the relevant time period, JPMS illicitly won bids for at least 41 municipal reinvestment instruments, and submitted at least 52 purposely non-winning bids.  JPMS made material misrepresentations and/or omissions, including by executing false certifications to the effect that the bids were the product of a bona fide solicitation, i.e., they were competitive and not tainted by undisclosed consultations, agreements, or payments and reflected fair market value for the purchase of the reinvestment instrument.

5.      By engaging in the misconduct described herein, JPMS, a registered broker-dealer, violated Section 15(c)(1)(A) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C § 78o(c)(1)(A).

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §§ 78u(d)].  The Commission seeks a permanent injunction against JPMS, enjoining it from engaging in the acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

7.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  JPMS, directly or indirectly, used the mails or the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities by means of a manipulative, deceptive, or other fraudulent device or contrivance.

8.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [15U.S.C. § 78aa].  Certain of the acts, practices, and course of conduct constituting the

violations of law alleged herein occurred within the District of New Jersey.  For example, as set

forth below, in Transaction C, JPMS fraudulently rigged a bid that it won concerning

investment proceeds of Municipality C, a New Jersey entity, and knowingly made

misrepresentations that it knew would be provided to the New Jersey entity.

### DEFENDANT

9.     JPMS is a Delaware limited liability corporation with its principal place of

business in New York, New York.  JPMS is registered with the Commission, pursuant to Sections

15(b) and 15B(a) of the Exchange Act, as a broker-dealer and as a municipal securities dealer,

respectfully.  JPMS is a wholly-owned subsidiary of JPMorgan Chase & Co. ("JPMorgan

Chase"), a publicly-traded financial holding company, incorporated in Delaware, with its

principal place of business in New York, NY, and operations in Jersey City, NJ.  At all relevant

times, JPMS operated and acted by and through its agents and employees.

10.     On September 1, 2010, JPMS assumed all of the assets and liabilities of its

predecessor, J.P. Morgan Securities Inc.  The misconduct alleged herein is limited to that of J.P.

Morgan Securities Inc. during the period of 1997 through 2005.

### RELATED PARTY

11.     JPMorgan Chase Bank is a federally-chartered bank.  In each of the instances

described within the Complaint, JPMS acted as agent for JP Morgan Chase Bank in placing its

bids.  JPMorgan Chase Bank issued the reinvestment instruments that JPMS bid upon through

the fraudulent bidding processes.

**FACTS**

**A.    Background**

12.    Municipalities from time to time publicly offer and sell tax-exempt bonds and notes to finance various capital projects such as schools, highways, and hospitals, or to refinance existing bonds or notes.  In addition, municipalities issue tax-exempt securities for the benefit of third-party conduit borrowers, such as hospitals, colleges and universities, and certain industrial corporations.  When these municipal securities are sold, portions of the proceeds are often not typically spent immediately.  Instead, the proceeds are temporarily invested pending their use for the original purpose of the securities offering.  Such proceeds are typically invested in financial instruments tailored to meet municipalities' specific collateral and spend-down needs, such as guaranteed investment contracts ("GICs"), repurchase agreements ("Repos"); and forward purchase agreements ("FPAs").

13.    GICs, Repos, and FPAs constitute securities or contracts to buy, sell, or loan securities.  The GICs, Repos, and FPAs at issue were bid in connection with the sale of the underlying municipal securities.  These instruments are often sold by major financial institutions, including broker-dealers, commercial banks, investment banks, insurance companies, and financial services companies (collectively "Providers").

14.    GICs are typically contracts providing for the repayment of principal and a fixed rate of interest on the amount invested for a specified period of time that permit the investing Municipality to withdraw funds as needed.  GICs are generally uncollateralized and issued by special purpose entities that obtain "guarantees" in the form of insurance policies from highly rated insurance companies.  Repos are contracts that provide for the purchase by Municipalities of U.S. government securities from entities such as JPMS, under which the seller also agrees to

buy back, or repurchase, those securities in accordance with the needs of the Municipality at specified prices on one or more future dates. FPAs similarly are contracts for the purchase by Municipalities of U.S. government securities from entities such as JP Morgan Chase Bank, but instead of being repurchased by the seller, the underlying U.S. government securities mature on future dates in accordance with the needs of the Municipality.

15.     In order to preserve the tax-exempt status of municipal securities under the relevant tax regulations [26 C.F.R. § 1.148-5(d)(6)], generally these investments must be purchased at fair market value. Typically, Municipalities establish fair market value through a competitive bidding process as set forth in the tax regulations. Among other things, these detailed tax regulations require the Municipality issuing the municipal securities to make a bona fide solicitation for the purchase of investments. This requires, in part, that all prospective Providers bidding on certain types of investments must be given an equal opportunity to bid, that all prospective Providers bidding on an investment make detailed written representations concerning the bidding process, and that similar written certifications are provided by the winning Provider ("Provider Certificates"). A failure to comply with these bidding requirements for certain types of investments creates a rebuttable presumption that the investment was not purchased at fair market value. Conversely, for certain types of investments, compliance with these detailed bidding regulations creates a conclusive safe harbor for establishing the fair market value of the reinvestment instruments.

16.     In situations where the tax-exempt status of the underlying municipal securities was not at issue, Municipalities also at times use the competitive bidding process and require Providers to make similar representations and certifications of a fair process to ensure that the

Municipalities receive the best prices for the instruments at issue and to avoid the appearance of affording any particular entity favored treatment.

**B.     The Fraudulent Conduct**

17.     From at least 1997 through at least 2005, JPMS engaged in fraudulent practices in connection with the bidding of investment instruments – including GICs, Repos, and FPAs. JPMS, among other things, submitted bids that it knew were set-up in advance for it to win; submitted bids with the aid of advance information from the Bidding Agents regarding the competing Providers' bids; and submitted purposely non-winning bids. JPMS engaged in these fraudulent bidding practices in connection with certain reinvestment instruments as the agent for its affiliated commercial bank, J.P. Morgan Chase Bank.

18.     JPMS's bids for the reinvestment instruments were submitted by members of its Municipal Derivatives Desk (the "Desk"), who were referred to as marketers. Many JPMS marketers, and the head of the Desk, who also served as a JPMS managing director, knowingly participated in the fraudulent bidding for certain municipal reinvestment instruments.

19.     JPMS rigged bids with the assistance of at least eleven different Bidding Agents for the reinvestment of the proceeds of municipal securities through a variety of mechanisms, including providing Last Looks.

20.     Bidding Agents afforded JPMS Last Looks in order to allow JPMS:

a.      to formulate its original bid with the use of information concerning the prices, price levels, rates, conditions or other information related to the bids of competing Providers;

b.      to revise a losing bid upwards so that the JPMS would win the bid; and/or

c.      to lower a previously submitted winning bid to a level at which JPMS would win the bid with additional profit (which, those involved often described as "not leaving money on the table").

21.      JPMS, certain Bidding Agents, and certain other Providers also rigged bids by deliberately obtaining off-market, purposely non-winning bids, including Courtesy Bids, so that the favored Providers could win the transactions.  JPMS also knew that Bidding Agents rigged bids in advance for JPMS to win by drafting the bid specifications to favor JPMS; by limiting the pool of prospective bidders; and by including less competitive firms in the pool of prospective bidders.

22.      In exchange for this improper, preferential treatment, and in furtherance of the fraudulent schemes, JPMS steered additional business towards Bidding Agents who participated in the bid rigging scheme, and provided purposely non-winning bids to allow other Providers to win bids in ostensibly competitive bidding processes.

23.      JPMS omitted to disclose the aforementioned misconduct.  Instead, in certain instances, JPMS falsely represented or certified in its bid submissions and its Provider's Certificates that, among other things: its bids were arms-length bids; JPMS had not consulted with any other potential Provider about its bids; its bids were determined without regard to any other formal or informal agreement that JPMS had with the Municipality or any other person (whether or not in connection with the bond issue); and/or that its bids were not submitted solely as a courtesy to the Municipality or any other person for purposes of satisfying the requirements that (a) the Municipality receive at least three bids from disinterested Providers that the Municipality solicited under a bona fide solicitation and (b) at least one of the three bids received was from a reasonably competitive Provider.

24.     JPMS knew that these false representations and Provider's Certificates were forwarded to the Bidding Agents, who were the agents of the Municipalities, and often to the Municipalities themselves, by means and instrumentalities of interstate commerce, usually telephone calls and subsequent facsimile transmissions.

## C.     Representative Fraudulent Transactions

25.     JPMS engaged in fraudulent bidding practices on at least 93 occasions during the relevant time period through Last Looks, Set-Ups, and the submission of purposely non-winning bids.  The following examples illustrate the conduct described above.

### Transaction A

26.     Transaction A was a Last Look.  In July 2000, JPMS underwrote a $55,000,000 offering of revenue bonds and caused Municipality A, a California entity, to select Bidding Agent A as its Bidding Agent.  As agreed upon with JPMS, in return for this business, Bidding Agent A restricted the list of prospective bidders and afforded JPMS Last Looks with respect to two bids for the temporary investment of proceeds of the aforementioned bonds.  Consequently, JPMS won both tainted bids which involved a debt service reserve fund, a project fund, a capitalized interest fund, and a working capital fund.

27.     In addition, in October 2000, after the responsible JPMS banker had left JPMS's employ, Bidding Agent A paid him approximately $19,600 in cash for causing Municipality A to select Bidding Agent A as the Bidding Agent.  The payments were made after the JPMS banker had caused JPMS to refer another transaction to Bidding Agent A, which JPMS and Bidding Agent A also rigged to enable JPMS to win the bid for the debt service reserve fund.

28.     Despite knowingly receiving Last Looks, as well as a promise of cash payments, JPMS, in connection with both bids, represented, among other things, in its bid submissions, that

its bids were determined without regard to any other formal or informal agreement with the issuer or any other person and that Bidding Agent A had not provided it with any information which induced JPMS to bid a yield lower than the yield induced by the Request for Bids. Likewise, Bidding Agent A falsely certified, among other things, that it had conducted a bona fide solicitation for the two investment contracts at issue.

**Transaction B**

29.     **Transaction B was a Set-up.**  In late 1993, Municipality B, a Tennessee entity, issued $53,500,000 in airport revenue and refunding bonds and temporarily invested the proceeds thereof in municipal derivatives -- including a FPA for a debt service reserve fund.  In the fall of 2001, Municipality B sought a new FPA for the debt service reserve fund, which its board decided would be awarded through the competitive bidding process to the Provider submitting the bid with the highest upfront payment.  JPMS, however, acting both as agent for the Provider and essentially as the defacto Bidding Agent, rigged this bid so that it would win the FPA, by, among other things, limiting the bid list to potential Providers who agreed in advance to submit purposely non-winning bids.

30.     JPMS, in order to rig this bid for itself, took advantage of the fact that the Municipality B's chief financial officer ("CFO") did not want to pay fees to a Bidding Agent and instead preferred that the prospective Providers submit their bids directly to him.  However, JPMS -- with the aid of Bidding Agent B -- surreptitiously assumed the role of the Bidding Agent.  Indeed, JPMS drafted the bid specifications and with the help of Bidding Agent B, created a list of prospective Providers who agreed, in advance, to submit purposely non-winning bids.

31.     As per the agreement, several prospective Providers submitted purposely non-winning bids.  Initially, however, the "competing" Providers were wary of submitting purposely non-winning bids to the CFO, whom the Providers did not know, because they did not want to end up accidentally winning the bid.  As Bidding Agent B's representative advised JPMS, "the only difficulty was, you know, people would have been happy to do it through us.  They just got nervous putting in a number that they didn't really want to be hit on....  Somebody they don't know....  So that took a little stroking, but no real problem at all."  In the end, both JPMS and Bidding Agent B agreed that the corrupted bidding process had worked out as JPMS had intended it to do and JPMS thanked Bidding Agent B for its help.

32.     The purposely non-winning bids solicited by JPMS created a false impression that potential Providers competed in good faith for Municipality B's FPA.

33.     Because it was improper for JPMS to operate as both an agent for a bidding Provider (who won the bid) and as the Bidding Agent, JPMS took extraordinary measures to ensure that its role in the creation of the bid list would remain hidden.  For example, the head of the desk, a JPMS Managing Director, expressly did not want to provide the list of addresses of the prospective Providers over the phone; rather he opted to fax it to a JPMS Employee in JPMS's Tampa Office.  Approximately one hour later, the Managing Director telephoned the JPMS Employee to confirm receipt of the aforementioned fax.  The JPMS Employee, during that call, advised the Managing Director that he had received the fax and was "just putting it into email format" in order to send it to the CFO.  At that juncture, the Managing Director cautioned him against sending the information in an e-mail because "there is a paper trail associated with that...."  The Managing Director then suggested that what he "would do is just make sure it doesn't have any markings on it, or whatever, and just put it in the overnight mail to him [i.e.,

Municipality B's CFO]…." The JPMS Employee suggested alternatively that he could fax the bid list to the CFO. To avoid a paper trail, the Managing Director also expressed his dislike of his colleague's alternative suggestion that he transmit the lists to Municipality B via fax.

34.     The next day, the JPMS Employee confirmed that he had sent the original fax, along with copies, of the list of the potential Providers' addresses to the CFO of Municipality B by depositing them in mailboxes in Tampa. When the Managing Director inquired whether his colleague believed in the "paper trail thing," the JPMS Marketer responded, "…I thought I had actually assessed the situation, and I thought it was worse by having [overnight] mail, you know a label. Sometimes they keep that stuff." Outraged by this specter of a paper trail, the Managing Director exclaimed "No!"

35.     With the assistance of Bidding Agent B, JPMS fraudulently won the FPA for the debt service reserve fund with the putative highest upfront payment of $1,325,000. JPMS, however, never disclosed to Municipality B's Board, which had instructed that the reinvestment instrument be purchased through the competitive bidding process, that JPMS had rigged the bidding process for its own benefit.

**Transaction C**

36.     Transaction C was a Last Look. Municipality C, a New Jersey entity, issued $690,000,000 of municipal bonds for the purpose of, among other things, funding a portion of the state transportation system costs. In connection with the temporary investment of the proceeds from these bonds, Municipality C also retained the services of Bidding Agent B to bid out the FPA for a project fund. JPMS – with the help of Bidding Agent B – won this tainted bid through Last Looks.

37.     The bid was scheduled for May 8, 2002, at 1:00 p.m.  The bid form stated that "[t]his bid is for not less than _____ of the Invested Amount."  The minimum invested amount a bidder could bid on was $150,000,000 and the maximum invested amount was $690,000,000.  Bidders could also bid on any amount between these two numbers.  The FPA was to be awarded to the Provider that agreed to pay the highest yield.  On the morning of the bid, a telephoned discussion ensued between a Bidding Agent B representative and a JPMS Marketer, in which the JPMS Marketer asked the representative if he had heard "anything in terms of a rate?"  Bidding Agent B's representative responded that he hoped it would be 2.5% or better and that "I will give you as much help as I can with this trade."  Shortly after 1:00 p.m. that same day, the JPMS Marketer telephoned Bidding Agent B's representative and was advised that the representative had not received many numbers and that a representative would call him back.  Before concluding their conversation, the JPMS Marketer advised Bidding Agent B's representative that he should be able to get a rate of 2.6%.

38.     Two to three minutes later, Bidding Agent B's representative telephoned the JPMS Marketer to advise him that the transaction would probably get done close to 2.7% on a semi-annual basis.  The JPMS Marketer responded that he was nowhere near that number; rather he was at 2.64%.  Bidding Agent B's representative stated that the highest bid that he had received to date was 2.7%.  Within five minutes of the aforementioned call, the JPMS Marketer again telephoned Bidding Agent B's representative to inquire whether Bidding Agent B had received all the bids.  Bidding Agent B's representative responded negatively to this inquiry and again averred "I will call you back."

39.     Consistent with that averment, Bidding Agent B's representative telephoned the JPMS Marketer and asked him "what is the maximum dollar amount you want to do?"  The

JPMS Marketer responded that for everything, he was at 2.684% on a semi-annual basis.  In reply, Bidding Agent B's representative offered to allocate $290,000,000 to JPMS at a rate of 2.684%: "$290,000,000 is that comfortable with you?  Here's the deal:  I have [another Provider] for $400,000,000 for 2.713[%]; so I would award them $400,000,000 at the level and award you the remaining $290,000,000 at 2.684[%]" – a rate that would have been higher than another bid of 2.6825% for a deposit amount not less than $200,000,000.  The JPMS Marketer, however, lowered the rate he would pay for that amount from 2.684 to 2.68%, and Bidding Agent B's representative agreed to allocate $290,000,000 to JPMS at that lower rate.

40.    By letter dated May 8, 2002, Bidding Agent B falsely reported to Municipality C that JPMS had submitted a bid rate of 2.68% for an amount not to exceed $690,000,000.  Rather, as set forth above, the JPMS Marketer initially advised Bidding Agent B's representative that JPMS's bid for an amount of $690,000,000 was 2.64%.  After discussions with Bidding Agent B's representative concerning other bids, the JPMS Marketer raised JPMS's bid for the aforementioned amount to 2.684% and subsequently lowered it to 2.68% for a deposit amount of $290,000,000.  JPMS's written bid, however, does not identify the investment amount sought.

41.    Despite the rigging of the deal so that JPMS would win a FPA for the investment of a $290,000,000 project fund, JPMS falsely certified in its bid submission that its bid "[wa]s an arms-length bid and [wa]s market based[,]" and represented, among other things, "that the bid was determined without any regard to any other formal or informal agreement that the potential Bidder ha[d] with the Authority or any other person[,]" and that "the bidder did not have the opportunity to review other bids (i.e., a Last Look) before providing a bid."

**Transaction D**

42.     Transaction D was a Last Look.  In May 2005, Municipality D, a Kansas entity,

issued $65,000,000 of general obligation school bonds.  In connection therewith, Municipality D

also retained the services of Bidding Agent C to bid out a Repo for the investment of project

funds.  The bids were supposed to be submitted at 1:00 p.m., on May 26, 2005, and awarded that

same day to the Provider that submitted the highest rate of interest.  During the bidding process,

Bidding Agent C allowed JPMS to reduce a winning bid so that JPMS would win the transaction

with a wider profit.

43.     Shortly after 1:00 p.m., on May 26, 2005, a JPMS Marketer telephoned Bidding

Agent C's representative to submit JPMS's bid of 3.761%.  Bidding Agent C's representative

signaled to the JPMS Marketer that his bid was high and suggested that he check his numbers.

44.     Approximately, seven minutes later, the JPMS Marketer called Bidding Agent C's

representative and lowered JPMS's bid to 3.751%.  Within ten minutes of the call, the bid was

awarded to JPMS.  At that time, in response to the JPMS Marketer's inquiry, Bidding Agent C

advised him that the cover bid was 3.646%.  The JPMS Marketer expressed dismay at the

distance between JPMS's reduced winning bid and the cover bid – suggesting the Bidding Agent

should have provided more detailed information about how the other bids compared to his bid.

At that juncture, the Bidding Agent reminded the JPMS Marketer that she had previously

signaled to him that he was leaving money on the table.

45.     In connection with this transaction, despite knowingly receiving improper

information from the Bidding Agent, JPMS, among other things, falsely represented in its bid

submission that Bidding Agent C had "not provided [JPMS] any information which induced

[JPMS] to bid a rate lower than the rate induced by the Request for Bids."  In addition, Bidding

Agent C certified, among other things, that it had conducted a bona fide solicitation for bids and that "[a]ll potential Providers had an equal opportunity to bid, and no potential Provider was given the opportunity to review other bids (*i.e.*, a Last Look) before submitting a bid."

**Transaction E**

46.     Transaction E was a Last Look.  Municipality E, a Texas entity, in February 2005, issued $233,967,610.70 of municipal securities, consisting of revenue bonds and revenue bond anticipation notes.  Proceeds from these municipal securities were to be used, among other things, to finance the costs of planning, designing, engineering and constructing certain turnpike projects.  Once again, JPMS was allowed to revise its winning bid for the investment of the vast majority of these proceeds downward – which necessarily increased its profit, while lowering the return on the investment proceeds earned by Municipality E.

47.     Municipality E retained Bidding Agent D, one of its financial advisors used in connection with the sale and issuance of the aforementioned securities, to bid out the construction and capitalized interest funds.  The "Invitation to bid for Repurchase Agreement," drafted by the Bidding Agent, provided that the objective of the bidding process was to, among other things, "lock[] in the highest available level of interest earnings."  Bids were supposed to be submitted in writing on or about 11:00 a.m. Eastern time, on February 15, 2005.

48.     Shortly after 11:00 a.m., a JPMS Marketer telephoned Bidding Agent D's representative to advise him that JPMS's bid rate was 3.371%.  After the submission of JPMS's bid, the JPMS Marketer and Bidding Agent D's representative discussed a number of bid-related issues such as termination and downgrade provisions.  During this discussion, the JPMS Marketer inquired about a legal opinion – to which Bidding Agent D responded:  "Well, if you need it, you're going to have to pay for it…."  Given that the cost of such an opinion would be

approximately $4,500, Bidding Agent D's representative asked the JPMS Marketer if he wanted to reduce his bid rate. The JPMS Marketer took advantage of this opportunity and reduced his bid from 3.371% to 3.365% to reflect the cost of a legal opinion.

49.     Rather than simply accept JPMS's reduced bid of 3.365%, Bidding Agent D's representative signaled to the JPMS Marketer that he had left money on the table and that he might want to reduce JPMS's bid even more: "…Well do you want a 3.3, what, 3.35, is that where you want to be?" The JPMS Marketer took advantage of the opportunity that Bidding Agent D's representative had given him to reduce his winning bid to 3.35%.

50.     Despite the fact that JPMS fraudulently won the bid by reducing an already winning bid rate to a lower level suggested by the Bidding Agent, JPMS falsely certified, among other things, that JPMS's bid was the product of an arm's-length transaction, that it was determined without regard to any other formal or informal agreement that the potential Provider had with the issuer or any other person (whether or not in connection with the bond issue), and that the bidder did not have the opportunity to review other bids before providing its bid.

51.     JPMS also acknowledged that Municipality E and its bond counsel would rely upon JPMS's Provider's certificate for the purpose of reaching a conclusion on whether or not the bonds constituted arbitrage bonds.

52.     Similarly, Bidding Agent D certified that it had made a bona fide solicitation for the investment contract at issue; that all potential Providers had had an equal opportunity to bid; and that the winning bid was the highest yielding bona fide bid for the investment contract (determined net of broker's fees).

53.    Based on the representations of JPMS and Bidding Agent D, Municipality E certified that the Repo was awarded through a bona fide solicitation and that all potential Providers had had an equal opportunity to bid.

**Transaction F**

54.    Transaction F was a purposely non-winning bid.  A certain firm underwrote a $145,000,000 offering of revenue bonds and, on October 23, 2001, arranged for its related commercial bank to win, through the mechanism of a fraudulent set-up, the bid for one of the instruments in which the offering proceeds would be invested.  To facilitate the rigging of this transaction, Bidding Agent A secured a purposely non-winning bid from JPMS.  JPMS knew it was being asked to submit a non-winning bid, and, a JPMS Marketer needed Bidding Agent A's help to formulate its bid not only to ensure its bid was in an appropriate range, but also to ensure its bid would not win.

55.    At 12:47 pm – thirteen minutes before bids were due – a JPMS Marketer returned Bidding Agent A's representative's telephone call.  At that time, knowing that JPMS had been asked to submit a purposely non-winning bid, the JPMS Marketer asked Bidding Agent A's representative if he would tell her "where the market is" – which he agreed to do.  Eleven minutes later, Bidding Agent A's representative telephoned the JPMS Marketer and provided her with information about where the winning bids would likely be:  Option No. 1, a European option, would probably get done around 5.60% and Option No. 2, a Bermudan option, around 5.73%.  Thereafter, the JPMS Marketer advised the representative that JPMS would bid 5%.  Bidding Agent A's representative objected to that bid on the grounds that it did not distinguish between the two options and because the bid was "really low."  In response, the JPMS Marketer said she could "go in anywhere just as long as I don't get hit."  Bidding Agent A's representative

assured her that she would not win the transaction and advised her that he thought JPMS should

bid "around 5 and a half." The JPMS Marketer then agreed to submit a bid of 5.40%. Finally,

Bidding Agent A's representative averred that JPMS's bids would be "5.40 and 5.50" – which

the JPMS Marketer confirmed.

56.     The winning Provider won the bids at 5.61% and 5.74%. JPMS's purposely non-

winning bids placed 4th among 5 bids.

57.     Despite the misconduct set forth above, in its bid submission, JPMS represented,

among other things, "that the bids were determined without regard to any other formal or

information agreement with the issuer or any other person; and that the bid was not submitted

solely as a courtesy to the issuer or any other person for the purpose of satisfying the applicable

treasury regulations[;]" and that JPMS had received the request for bids in a timely manner.

## CLAIM FOR RELIEF

### Violation of Section 15(c)(1)(A) of the Exchange Act

58.     The Commission re-alleges and incorporates by reference each and every

allegation in paragraphs 1 through 57, as if the same were fully set forth herein.

59.     At all relevant times, JPMS was a registered broker-dealer pursuant to Section

15(b) of the Exchange Act, [15 U.S.C. § 78o(b)].

60.     As alleged herein, JPMS, directly or indirectly, by use of the means or

instrumentalities of interstate commerce effected transactions in, or induced or attempted to

induce the purchase or sale of securities by means of a manipulative, deceptive, or other

fraudulent device or contrivance.

61.     JPMS's fraudulent misrepresentations and omissions described above were made

either knowingly or recklessly.

62.     By reasons of the foregoing, JPMS violated, and unless enjoined will continue to violate, Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining JPMS from violating, directly or indirectly, Section 15(c) of the Exchange Act [15 U.S.C. § 78o(c)];

### II.

Ordering JPMS to disgorge all illegal profits that it obtained as a result of the fraudulent conduct described in this Complaint, together with prejudgment interest thereon;

### III.

Imposing civil monetary penalties on JPMS pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting such equitable relief as may be appropriate or necessary pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

Respectfully submitted,

BY: _Mary P. Hansen_

Mary P. Hansen
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
hansenm@sec.gov

Of Counsel:
Elaine C. Greenberg
Daniel M. Hawke
Denise D. Colliers
G. Jeffrey Boujoukos
Scott A. Thompson

## **Certification**

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By:   *Mary P. Hansen*
        Mary P. Hansen
        Attorney for Plaintiff
        SECURITIES AND EXCHANGE
        COMMISSION
        Philadelphia Regional Office
        701 Market Street, Suite 2000
        Philadelphia, PA 19106